1
2
3

# UNITED STATES DISTRICT COURT

4

# EASTERN DISTRICT OF CALIFORNIA

5
6
7
8
9
10
11

| | |
|---|---|
| CULINARY STUDIOS, INC., et al.,<br><br>**Plaintiffs**<br><br>v.<br><br>GOVERNOR GAVIN NEWSOM, et al.,<br><br>**Defendants** | **CASE NO. 1:20-CV-1340 AWI EPG**<br><br>**ORDER ON DEFENDANTS' MOTIONS TO DISMISS**<br><br>(Doc. Nos. 15, 16, 17, 20) |

12     This case involves challenges to restrictions placed on businesses by Gov. Newsom and
13 various state agencies, the City of Fresno and former Fresno Mayor Lee Brand, and the County of
14 Fresno in response to Covid 19.  The case is brought primarily by restaurants but includes other
15 businesses such as fitness centers.  Plaintiffs intend for this matter to be a class action.  Currently
16 before the Court are three motions to dismiss, one by the entities affiliated with the State of
17 California ("State Entities"), one by the entities affiliated with the County of Fresno ("County
18 Entities"), and one by entities affiliated with the City of Fresno ("City Entities").  The State and
19 City Entities filed independent motions supported by briefing.  The County Entities joined the
20 State Entities' motion.  Plaintiffs opposes all of the motions.

21

22 **I.     BACKGROUND**

23     **A.     Plaintiffs' Complaint**

24     The First Amended Complaint ("FAC") brings suit against Gov. Newsom and California
25 Attorney General Xavier Becerra and former City of Fresno Mayor Lee Brand in their official
26 capacities, the State of California, the California Department of Alcoholic Beverages Control
27 ("CABC"),  the County of Fresno, the County of Fresno Department of Public Health, and the
28 City of Fresno.  In relevant part, the FAC makes the following allegations:

In March 2020, President Trump proclaimed a state of emergency from Covid 19.  On March 4, 2020, Gov. Newsom issued a state of emergency due to Covid 19.  On March 19, 2020, Gov. Newsom issued executive order N-33-20 which *inter alia* mandated that all individuals in California stay home or their residences except as needed to maintain continuity of operations of 16 federal critical infrastructure sectors.  Gov. Newsom explained that the goal was to bend the curve and disrupt the spread of the virus.  Gov. Newsom directed the Office of Emergency Services to take all necessary steps to ensure compliance with the order and that the order was to be enforceable pursuant to California law.  Businesses such as those owned by Plaintiffs who did not fit within the 16 essential sectors were deemed "Non-Essential."  Non-essential businesses were effectively ordered under penalty of fines and/or imprisonment to shut down.  However, business such as Target, Walmart, and Home Depot were allowed to remain open for premises shopping since they were deemed to be essential.  Gov. Newsom's executive orders do not provide for a pre- or post- deprivation remedy to question essential/non-essential status or to determine if Plaintiffs can open with the same health related protocols as essential businesses.

Defendants' orders have caused widespread and catastrophic damage to California's economy through government mandated closure of non-essential businesses.  Plaintiffs have faced numerous difficulties with respect to financial obligations and have been forced to lay off significant numbers of employees.  Plaintiffs face a real and existential threat to their survival and business operations.  They have laid off at least 5,000 workers and lost no less than $200 million in revenue.  Since the initial outbreak in February/March 2020 of Covid 19, the federal government's projections of anticipated deaths have decreased substantially.  Despite the decrease, Defendants have increasingly restricted, if not outright banned, Plaintiffs' engagement of constitutionally protected activities.  Defendants' orders have forced Plaintiffs through threat of criminal penalties to close their indoor operations, depriving them of liberty and property interests without due process.  At the same time, Gov. Newsom allowed and is allowing other restaurants and businesses  throughout the state to remain open  for indoor dining and indoor operations, even though those businesses must adhere to CDC guidelines on social distancing and Plaintiffs are fully capable of adhering to those same guidelines.

1    Defendants' orders should be enjoined under 42 U.S.C. § 1983 because the orders:  (1)
2   plainly violate the Due Process and Equal Protection Clauses of the Fifth and Fourteenth
3   Amendments since they unconstitutionally and disparately apply one set of rules to businesses
4   deemed essential versus all other businesses that are deemed non-essential, when in fact all
5   businesses are essential to the health, welfare, and wellbeing of its citizens; (2) the orders amount
6   to an impermissible partial or complete taking in violation of the Fifth Amendment's Takings
7   Clause; and (3) the orders violate the substantive and procedural due process clauses of the Fifth
8   and Fourteenth Amendments.  The orders also violate Article 1, Sections 1, 7, and 19 of the
9   California Constitution.

10    Plaintiffs allege that labeling them as non-essential is irrational, arbitrary, and capricious
11   and bears no rational basis to any valid government interest.  Plaintiffs also allege that the orders
12   are not narrowly tailored to further a compelling governmental interest.  Defendants have granted
13   numerous special exemptions to their bans on public gatherings, including for essential businesses,
14   provided that social distancing is observed.  Since such gatherings are permitted, Defendants must
15   permit Plaintiffs to engage in such activities provided that social distancing guideline are also
16   followed.

17    From these allegations, Plaintiffs allege 6 counts.

18    Count 1 alleges a claim for Procedural Due Process under the Fourteenth Amendment.
19   Citing *Sacramento v. Lewis*, 523 U.S. 833, 845 (1988), Plaintiffs allege that they have a protected
20   liberty interest in the right to live without arbitrary governmental interference with their liberty
21   and property interests.  Pursuant to *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 572
22   (1972), liberty "denotes not merely the freedom from bodily restraint but also the right of the
23   individual to contract, to engage in any of the common occupations of life, to acquire useful
24   knowledge, to marry, establish a home and bring up children, to worship God according to the
25   dictates of his own conscience, and generally to enjoy those privileges long recognized  . . .  as
26   essential to the orderly pursuit of happiness by free men."  Plaintiffs allege that they also have
27   protected liberty and property interests in the right to intrastate travel and to engage in commerce
28   by operating indoor dining, and those interests are being infringed by the orders.  The orders at

issue provided no process before issuance and provide for no post-deprivation review.  By failing to provide for pre- or post-deprivation review, Plaintiffs have lost significant revenue.

Count 2 alleges violation of the Substantive Due Process under the Fourteenth Amendment.  Plaintiffs allege that the orders shock the conscience and interfere with rights implicit in the concept of ordered liberty.  Specifically, the orders interfere with the right to work, to contract, and to engage in commerce.  Plaintiffs allege that they can conduct business safely and in compliance with otherwise applicable rules.  Plaintiffs allege that the orders are not narrowly tailored to serve a compelling state interest.  They allege that there is also no rational basis for the orders since the Covid 19 virus is under control and Plaintiffs are capable of following guidelines to safely conducti business.

Count 3 alleges violation of Equal Protection under the Fourteenth Amendment.  Plaintiffs allege that restaurants and businesses throughout the state are permitted to operate indoor dining and activities, yet Plaintiffs are not.  Defendants placed these restrictions without any evidence demonstrating that indoor dining in Plaintiffs' businesses somehow increases a person's chances of contracting Covid 19.  Under Gov. Newsom's orders, Plaintiffs' businesses must remain closed for indoor dining while businesses just hours away can open for indoor operations, even though Plaintiffs can implement the same otherwise applicable social distancing guidelines.

Count 4 alleges violation of Equal Protection under Art. 1, Sec. 7(a) of the California Constitution.  Plaintiffs allege that classifying businesses as either essential or non-essential, or based on location, treats businesses differently.

Count 5 (unnumbered in the FAC but plead separately) requests a preliminary injunction against enforcement of the various orders.

Count 6 (unnumbered in the FAC but plead separately) alleges a violation of the Fifth Amendment's Takings Clause.  Plaintiffs allege that Defendants ordered them to shut down and cease all indoor operations in order to curb the spread of Covid 19.  This mandate completely and unconstitutionally deprived Plaintiffs of economically beneficial use of their business without just compensation.  The orders have affected a complete and total regulatory and physical taking of Plaintiffs' property without just compensation.

1    In their Prayer, Plaintiffs request designation of this case as a class action, declaratory

2    relief that the executive orders violate Plaintiffs' constitutional rights, a preliminary injunction

3    enjoining further enforcement of the executive orders, just compensation in an amount of no less

4    than $200 million, attorneys' fees, and any other suitable relief.

5    **B.    State Entities' Motion to Dismiss**

6    Initially, the State Entities set out the regulatory history surrounding Covid 19.  The State

7    Entities divide the Covid 19 response into 4 phases.  First, there was Gov. Newsom's March 2020

8    declaration of a state of emergency which led to stay at home orders.  Second, on April 28, 2020,

9    Gov. Newsom announced a "Resilience Roadmap" which provided for a four stage gradual

10   reopening of California.  Third, in response to a resurgence of Covid 19 in July 2020, on August

11   28, 2020, a "Blueprint for a Safer Economy" was implemented which placed every county in one

12   of four tiers (yellow/minimal, orange/moderate, red/substantial, and purple/widespread) based on

13   Covid 19 transmission rates within the county.  The Blueprint permits a broader range of

14   reopening guided by risk-based criteria pertinent to each sector.  Restrictions on businesses and

15   activities varies by tier level, with greater restrictions in tiers with greater transmission rates.

16   Fourth, the State Entities note that the spread of Covid 19 has again worsened throughout

17   California and the rest of the United States which has led to counties being moved into more

18   restrictive tiers.

19   The State Entities make a number of legal arguments.  First, the Eleventh Amendment bars

20   all federal claims against the State of California and CABC, Plaintiffs' claims under § 1983 for

21   just compensation, and all state law claims.

22   Second, under *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the challenged orders are a

23   permissible exercise of the state's emergency powers.  *Jacobson* recognizes that a community has

24   a right to protect itself against an epidemic of disease which threatens the safety of its members. In

25   response to a public health threat, a state may enact quarantine laws and health laws of every

26   description.  *Jacobson* further recognizes that constitutional rights may be reasonably restricted as

27   the safety of the general public may demand.  As Chief Justice Roberts noted in his concurrence in

28   *South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613 (2020), where officials act in

5

areas fraught with medical and scientific uncertainties, their latitude must be especially broad and should not be subject to second guessing by an unelected federal judiciary.  Under *Jacobson*, restrictions imposed in response to a public health emergency should be upheld unless the restrictions:  (1) have no real or substantial relation to legitimate public health ends; or (2) are "beyond all question a plain, palpable invasion" of constitutional rights.  Here, the restrictions were specifically enacted to limit the spread of the novel, deadly, and highly contagious Covid 19 virus.  There is thus, a relation to a real or substantial public health end.  Every court to consider a challenge to these orders has agreed that the orders meet the first *Jacobson* prong.  Second, the challenged orders are not plain and palpable invasions of constitutional rights.  As explained *infra*, Plaintiffs have not plausibly alleged any constitutional violations.  But, even if they did, the temporary restrictions on their activities in light of the Covid 19 pandemic are not plain and palpable invasions.  The challenged orders do not ban Plaintiffs' businesses or require their complete closure, rather, they only require that businesses temporarily conduct any activities outdoors while Fresno County remains in the purple tier.  Once Fresno County is moved to a lower tier, indoor dining can be resumed.  Temporarily requiring activities to be conducted outdoors in counties facing heightened spread of Covid 19, limiting capacity in businesses, and requiring wearing face masks in public are not plain and palpable constitutional violations.

Third, under traditional constitutional standards, no plausible claims are alleged.

With respect to Procedural Due Process, assuming that Plaintiffs have a protected liberty interest, under *Halverson v. Skagit Cnty*, 42 F.3d 1257 (9th Cir. 1994), "governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing."  Rather, for actions that are legislative in nature, due process is satisfied when officials perform their responsibilities in the normal manner prescribed by law.  There is no allegation that Gov. Newsom's orders were not validly issued pursuant to the California Government Code.  The orders do not single out Plaintiffs but apply to all businesses.

With respect to substantive due process, Defendants argue that the range of liberty interests that are protected by the substantive due process clause are narrow and largely limited to marriage,

procreation, family relationships, child rearing, education, and bodily integrity.  Plaintiffs do not allege that such a right is at issue here.  While the Ninth Circuit has recognized a potential liberty interest in pursuing one's calling, those cases involve a complete prohibition on the right to engage in a calling and not brief interruptions.  Such a right is narrow and has not been held to be fundamental.  Here, the challenged orders do not impose a complete prohibition on Plaintiffs' operation of restaurants or fitness centers, since they can conduct outdoor operations.  Since Plaintiffs do not allege that a fundamental right has been impacted, their claims are subject to rational basis review.  This review permits decisions that are based on rational speculation unsupported by evidence or empirical data.  Courts accept generalization, even if there is an imperfect fit, or where line drawing is not made with mathematical nicety, or results in some inequality in practice.  The restrictions at issue are backed by science and target conduct that is known to increase the risk of Covid 19 transmission.  The orders are reasonably related to the State's legitimate interest in protecting public health and safety during a pandemic.  There is nothing about the orders that shock the conscience or violate the decencies of civilized conduct.  Temporarily limiting indoor operations is not egregious or akin to forced stomach pumping.

With respect to equal protection, Plaintiffs appear to allege that there is a distinction made between businesses based on essential and non-essential classification and/or physical location.  Contrary to Plaintiffs' arguments, the distinctions drawn in the orders are not based on whether a business can or cannot implement protective measures, rather, the tier determinations are based on the rate of transmission within the county and the consequent risks to those within the county of catching the disease.  Counties with higher transmission rates (as indicated by the case rate and the positivity rate) face greater restrictions than counties with lower transmission rates.  Even if businesses in counties with different transmission rates were similarly situated, such differential treatment does not implicate any suspect classification and surely survives rational basis review.  Imposing greater restrictions on business operations that could speed the spread of Covid 19 in counties that face higher rates of transmission in order to protect public health and safety satisfies rational basis review.  Also, the orders do not draw distinctions between essential and non-essential businesses.  Rather, they distinguish between different activities and business sectors and

impose restrictions based on the relative risk they pose in spreading Covid 19.  Businesses that pose a lower risk are permitted to open earlier or with fewer restrictions than in counties with high transmission rates, while businesses that pose a greater risk are required to close or face greater restrictions.  The highest risk activities, such as indoor spectator sports or conventions, are not permitted in any county.  The restrictions and distinctions are based on factors currently understood by the scientific community to increase the risk of transmission, such as whether a mask can be worn at all times, whether social distance is feasible, whether the activity is indoor or outdoor, and whether individuals spend a significant amount of time at the business.  In sum, this claim fails because there is no threshold showing that the orders treat similarly situated businesses differently (given that the restrictions are based on transmission rates), and, even if such a showing was made, the orders survive rational basis review.

Finally, with respect to the takings claim, Plaintiffs fail to identify a constitutionally protected property interest.  They identify no property that is impacted and only allege in general terms that they have lost revenue because their businesses are less profitable than they otherwise would be.  However, even if a legally protected property interest were identified, the orders do not physically invade or take property, nor do they constitute regulations that are so onerous that their effect is tantamount to a direct appropriation or ouster.  The orders do not eliminate all economically viable use of plaintiffs' businesses.  Plaintiffs' businesses can continue through outdoor operations.  The restrictions are temporary, and counties are reevaluated on a regular basis to determine whether they meet criteria for moving into a tier with looser restrictions.  The mere diminution in the value of property, however serious, is insufficient to demonstrate a taking.

### C.      City Entities' Motion to Dismiss

The City Entities argue that their efforts to address public health concerns followed the State's direction and are no more restrictive than the State orders.  On March 16, 2020, Mayor Brand declared a Local Emergency based on the threat of Covid 19 to the City.  This was followed by a series of orders that prohibited indoor dining.  On July 14, 2020, the City issued an emergency order that allowed for the reopening of restaurants following County and State health guidelines.

The City Entities make arguments that largely (though not completely) parallel and repeat the arguments made by the State Entities.  First, the City's orders fit within *Jacobson* and Chief Justice Roberts's concurrence in *South Bay United Pentecostal Church*.  The orders have a real and substantial relation to the crisis and are based on the scientific fact that limiting indoor physical contact between people is widely recognized as an effective way to slow the spread of Covid 19.

Second, the City Entities argue that no plausible claims are stated under traditional constitutional standards.  With respect to substantive due process, because the right to work is not a fundamental right, it is not subject to heightened scrutiny.  The temporary restrictions in the emergency orders do not shock the conscience and are rationally related to a legitimate government interest.  With respect to procedural due process, there is no Fifth Amendment claim possible because that provision protects against acts by the federal government.  Further, no Fourteenth Amendment claim is stated because the rights to intrastate travel and to engage in a chosen business is not implicated by the interests protected by the Fourteenth Amendment, and the Fourteenth Amendment does not apply to the emergency orders because they are legislative in nature and can be modified or vacated at any time.

Third, there are no allegations that the City Entities violated the Equal Protection clause (because those claims are based on the Governor treating different businesses in different counties differently), and in any event the orders are rationally related to protecting health and safety.

Fourth, there is no plausible Fifth Amendment Takings Clause claim.  A takings claim cannot be a substitute for a challenge to the substantive validity of a law, instead, a plaintiff may seek enjoinment of the law and damages but cannot seek compensation for a taking.  To the extent that Plaintiffs challenge the validity of the orders through the Takings Clause, that is improper.  Further, because no physical taking has occurred and there has not been a categorical regulatory taking of property, Plaintiffs are necessarily bringing a non-categorial regulatory taking claim.  There is not a sufficient non-categorical taking alleged.  The emergency orders are only a temporary disruption of business, the restrictions are negative in nature rather than an affirmative exploitation by the state, and the City has followed state and county guidelines and attempted to shift the benefits and burdens of economic life in an effort to keep citizens safe by closing its own

indoor enterprises and allowing delivery and takeout.

Fifth, Mayor Brand cannot be held individually liable for Fifth Amendment takings claims.

Finally, there is no independent claim for preliminary injunction because it is a remedy.

### D.    Plaintiffs' Opposition

Plaintiffs filed one unified opposition.  Plaintiffs argue that Gov. Newsom's orders do not appear to be based on scientific data.  Gov. Newsom's Resilience Roadmap and Blueprint plans were unveiled via press conference with little to no information being provided regarding the data that the State used to develop the criteria.  After the creation of the Blueprint, a new criteria was added, the "equity metric," which depends on such things as voter turnout and "clean environment."  Further, in response to a California Public Records Act request by reporter Katy Grimes of the Globe News outlet in Sacramento in May 2020, the Department of Health responded that it had no responsive documents.  The request asked for documents that have been used or are being used to guide or inform state or local social distancing measures to prevent Covid 19, as well as 2020 California mortality data.

Plaintiffs argue that *Jacobson* does not mean that a more deferential standard should apply during a period of crisis or emergency.  The Supreme Court recognized in *Home Bldg. & Loan Assn v. Blaisdell*, 290 U.S. 398 (1934) that emergency does not create power, or increase granted power, or remove or diminish restrictions imposed upon power that has been granted or reserved.  Although *Jacobson* upheld the immunization law at issue, it also recognized that there are limits to the government's police power in times of crisis.  *Jacobson* noted that no state rule or local regulation can contravene the Constitution or infringe on a right granted by the Constitution.  Nothing in *Jacobson* supports the proposition that the varying levels of constitutional review should be modified in the context of an emergency, particularly since *Jacobson* predates the Supreme Court's three levels of scrutiny (rational basis, intermediate, and strict) for reviewing allegedly unconstitutional laws or regulations.  If an emergency were permitted to lower the standard of review to rational basis for every constitutional challenge, the government could easily wipe out constitutional rights.  A city council's declaration of an emergency could be used to take property without the need of paying just compensation.  Moreover, even if more deference may be

1  applied at the outset of a pandemic, as was the case early on, that is no longer the case as some

2  eight months have passed since the original shut down orders were issued.

3        Plaintiffs argue that the Defendants have violated due process rights under the Fourteenth

4  Amendment.  The Fourteenth Amendment protects liberties regarding choices of individual

5  dignity and autonomy, as well as most of the rights enumerated in the Bill of Rights.  The

6  Defendants' orders deprive Plaintiffs of their right to personally exercise  their constitutional

7  rights and freedoms and deny Plaintiffs their rights and liberties in lawfully operating their

8  businesses by ordering the closure of Non-Essential businesses without providing a hearing to

9  present their case for their business not to be shutdown.  If anything, Plaintiffs should have been

10  able to decide for themselves whether to shut down if their businesses could not properly deal with

11  health and safety guidelines relating to Covid 19.  Plaintiffs were not given a meaningful

12  opportunity to respond to the order and to explain why the orders are so deeply flawed and

13  unconstitutional as applied to them.  As an example, it is unknown how the "equity metric"

14  rationally deals with Covid 19.  Because Defendants' decisions were made in reliance on arbitrary

15  and capricious interpretations of the California Constitution and related laws with respect to their

16  ability to order state-wide shelter in place and the closure of non-essential businesses, Plaintiffs

17  were deprived of their property rights without due process of law.

18        Plaintiffs argue that the Governor's orders and the Defendants' enforcement thereof violate

19  the equal protection clause, both facially and as applied to Plaintiffs.  The equal protection clause

20  requires the state to govern impartially and not draw arbitrary distinctions based solely on

21  differences that are irrelevant to legitimate government objectives.  Defendants have intentionally

22  and arbitrarily categorized California businesses and conduct as either essential or non-essential.

23  Those deemed essential are permitted to go about their business and activities provides that certain

24  social distancing practices are followed.  Those deemed non-essential are required to shut down

25  and have their workers stay in their residences.

26        Finally, Plaintiffs argue that the Eleventh Amendment does not bar the suit against them.

27  While damages are generally barred, prospective relief is not.  The relief sought in the FAC can be

28  limited to injunctive and declaratory relief on a prospective basis.  The prospective relief requested

in this cause would not have the effect of a full-fledged award of damages.  With respect to the City and County, the only claim relevant to these Defendants is whether they may be liable under the state constitution for a taking by way of the unconstitutional emergency orders.  It is well settled that counties and cities generally cannot assert Eleventh Amendment immunity.  The Ninth Circuit uses a five part test to determine whether a municipality may assert sovereign immunity.  Key to the five part test is the fact in this case that being forced to promulgate and enforce health orders at the direction of the State does not transmute the cities into arms of the State.  Exercising a slice of state power alone does not alone confer Eleventh Amendment immunity.

### E.    County Entities' Reply

The County Entities joined the State Entities' motion to dismiss without reservation.  However, the County Entities also filed a reply which included two arguments that were not made in their joinder.[1]  First, the County Entities argues that the FAC identifies conduct and orders issued by the City Entities and the State Entities, but there are no allegations that identify any orders or actions by the County Entities that caused any injuries to Plaintiffs.  The County is merely lumped together with the City Entities and the State Entities.  Second, the County Entities argue that they have no discretion to relax the orders, opt out of the orders, or adopt less restrictive measures.  In the context of the Covid 19 pandemic and the emergency public health orders issued, the County Entities are an arm of the State and entitled to Eleventh Amendment immunity.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory.  See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015).  In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.  Kwan v. SanMedica, Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017).  However,

---

[1] The Court permitted Plaintiffs to file a sur-reply, but they did not do so.

complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678; Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). "Plausibility" means "more than a sheer possibility," but less than a probability, and facts that are "merely consistent" with liability fall short of "plausibility." Iqbal, 556 U.S. at 678; Somers, 729 F.3d at 960. The Ninth Circuit has distilled the following principles for Rule 12(b)(6) motions: (1) to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively; (2) the factual allegations that are taken as true must plausibly suggest entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. Levitt v. Yelp! Inc., 765 F.3d 1123, 1135 (9th Cir. 2014). In assessing a motion to dismiss, courts may consider documents attached to the complaint, documents incorporated by reference in the complaint, or matters subject to judicial notice. In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1051 (9th Cir. 2014). If a motion to dismiss is granted, "[the] district court should grant leave to amend even if no request to amend the pleading was made . . . ." Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016). However, leave to amend need not be granted if amendment would be futile or the plaintiff has failed to cure deficiencies despite repeated opportunities. Garmon v. County of L.A., 828 F.3d 837, 842 (9th Cir. 2016).

1   **III.**   **JUDICIAL NOTICE**

2       The State and City Entities both seek to have certain public records of governmental

3   documents available on the internet judicially noticed. See. Docs. 15-1, 16-2, and 26.  A court may

4   take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally

5   known within the trial court's territorial jurisdiction; or (2) can be accurately and readily

6   determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

7   Consequently, a court may take judicial notice "of court filings and other matters of public

8   record." Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006); see

9   Dehoog v. Anheuser-Busch InBev SA/NV, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking judicial

10   notice of "government documents, court filings, press releases, and undisputed matters of public

11   record").  Specifically, "the court can take judicial notice of 'public records and government

12   documents available from reliable sources on the Internet, such as websites run by governmental

13   agencies.'" Romero v. Securus Techs., Inc., 216 F. Supp. 3d 1078, 1084 n.1 (S.D. Cal. 2016)

14   (quoting Gerritsen v. Warner Bros. Entm't Inc., 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015)); see

15   Cal. River Watch v. City of Vacaville, 2017 U.S. Dist. LEXIS 142560, at *6 n.1 (E.D. Cal. Aug.

16   30, 2017).  Defendants' requests for judicial notice are granted.[2]

17

18   **IV.**   **DISCUSSION**

19      **A.**   **Eleventh Amendment Immunity[3]**

20       Through the Eleventh Amendment, a state is immune from suit brought in federal court by

21   its own citizens or citizens of other states.  See Papasan v. Allain, 478 U.S. 265, 275 (1986);

22   Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 (1984); Walden v. Nevada, 945

23   F.3d 1088, 1092 (9th Cir. 2019).  Actions in federal court against agencies or instrumentalities of a

24

25   [2] The State Entities have provided the internet website addresses where the documents can be publicly accessed. See

26   Doc. 15-1, 1:24-3:27; Doc. 26, 1:25-2:4.  The City Entities have not provided the internet website addresses. See Doc. 16-2.  Plaintiffs have made no objection to taking judicial notice of these documents.  The court thus considers the City Entities' documents not subject to reasonable dispute for the purposes of this order only.

27

28   [3] Eleventh Amendment immunity issues are to be resolved prior to reaching the merits of a substantive challenge to a cause of action.  Coalition to Defend Affirmative Action v. Brown, 674 F.3d 1128, 1133 (9th Cir. 2012); Cardenas v. Anzai, 311 F.3d 929, 934 (9th Cir. 2002); In re Jackson, 184 F.3d 1046, 1048 (9th Cir. 1999).

state and officials of a state acting in their official capacity are also barred by the Eleventh

Amendment.  See Krainski v. State ex rel. Bd. of Regents, 616 F.3d 963, 967 (9th Cir. 2010);

Shaw v. State of Cal. Dept. of Alcoholic Beverage Control, 788 F.2d 600, 603 (9th Cir. 1986).

This immunity includes the adjudication of pendent state law claims against state defendants in

federal courts.  See Raygor v. Regents of the University of Minnesota, 534 U.S. 533, 540-41

(2002); Pennhurst, 465 U.S. at 106; Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir.

2004).  "Eleventh Amendment sovereign immunity limits the jurisdiction of the federal courts and

can be raised by a party at any time during judicial proceedings or by the court sua sponte."

California Franchise Tax Board v. Jackson (In re Jackson), 184 F.3d 1046, 1048 (9th Cir. 1999);

see also Edelman v. Jordan, 415 U.S. 651, 678 (1974).

Congress did not abrogate the states' Eleventh Amendment immunity from suit through

enactment of 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 344-45 (1979); Brown v.

California Dept. of Corr., 554 F.3d 747, 752 (9th Cir. 2009); Dittman v. California, 191 F.3d

1020, 1026 (9th Cir. 1999).  Furthermore, for purposes of suits under 42 U.S.C. § 1983, a state, its

agencies, and officials acting in their official capacity are not considered to be "persons" and

cannot be sued for monetary damages for a violation of that act.  See Will v. Michigan Dept. of

State Police, 491 U.S. 58, 70-71 (1989); Wolfe v. Strankman, 392 F.3d 358, 364-65 (9th Cir.

2004); Jackson v. Hayakawa, 682 F.2d 1344, 1350-51 (9th Cir. 1982).  However, under the *Ex*

*parte Young* exception,[4] a state official sued in his official capacity for injunctive relief is

considered a "person" under § 1983 because "official-capacity" actions for prospective relief are

not treated as actions against the State.  Will, 491 U.S. at 71 n.10; Wolfe, 392 F.3d at 365.  This

exception is based on a state's ongoing violation of the plaintiff's federal statutory or

constitutional rights.  Krainski, 616 F.3d at 697-68.  The *Ex parte Young* exception does not apply

when relief against a state official is sought under state law.  Doe v. Regents of the Univ. of Cal.,

891 F.3d 1147, 1153 (9th Cir. 2018).

    1.   State Entities

First, Plaintiffs may not recover monetary damages against Gov. Newsom, Atty. Gen.

---

[4] This exception refers to the case of *Ex parte Young*, 209 U.S. 123 (1908).

Becerra, the State of California, or the CABC[5] for violations of the California and Federal constitutions' respective due process and equal protection clauses.  The Eleventh Amendment bars such claims.  See Raygor, 534 U.S. at 540-41; Pennhurst, 465 U.S. at 106; Krainski, 616 F.3d at 697-68; Wolfe, 392 F.3d at 364; Cholla Ready Mix, 382 F.3d at 973; Shaw, 788 F.2d at 603.  Therefore, all claims against the "State Entities" for monetary damages based on state or federal constitutional equal protection and due process violations will be dismissed without leave to amend.

Second, Plaintiffs contend that the emergency orders are sufficiently onerous that they constitute a "taking" under the Fifth Amendment.[6]  This kind of claim, in which no formal eminent domain or condemnation process has been instituted yet a governmental taking has allegedly occurred, is referred to as "inverse condemnation" or "reverse condemnation."  See United States v. Clarke, 445 U.S. 253, 255-57 (1980).  Eleventh Amendment immunity prohibits Fifth Amendment inverse condemnation actions in federal court against a state.[7]  Jachetta v. United States, 653 F.3d 898, 909 (9th Cir. 2011); Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 956 (9th Cir. 2008).  Plaintiffs do not dispute Defendants' arguments that Plaintiffs cannot obtain "just compensation" for a Fifth Amendment takings claim in federal court.  Cf. Warnshuis v. Bausch Health U.S., LLC, 2020 U.S. Dist. LEXIS 107136, *6 n.1 (E.D. Cal. June 18, 2020) (finding that the failure to address arguments in a motion to dismiss clarified the claims being pursued and could be viewed as conceding arguments).  Therefore, Plaintiffs' Fifth Amendment Takings Clause claim for just compensation will be dismissed without leave to amend.

Third, the State Entities do not dispute that Plaintiffs may pursue prospective equitable relief through the *Ex parte Young* exception.  The *Ex parte Young* exception applies only against state officials who are sued in their official capacity and only as to the federal claims.  Doe, 891 F.3d at 1153; Wolfe, 392 F.3d at 365.  Therefore, Plaintiffs may pursue prospective injunctive and

---

[5] The CABC is a state agency that is entitled to Eleventh Amendment immunity.  Shaw, 788 F.2d at 603.

[6] The Fifth Amendment Takings Clause reads, "nor shall private property be taken for public use, without just compensation."  U.S. Const. amend V, cl. 4.

[7] The Eleventh Amendment/sovereign immunity will not bar recoveries in state court.  Jachetta, 653 F.3d at 909; Seven Up, 523 F.3d at 955.

declaratory relief against either Gov. Newsom or Atty. Gen. Becerra (but not CABC or the State of California) for on-going federal constitutional violations.  See Doe, 891 F.3d at 1153; Arizona Students' Ass'n v. Arizona Bd. of Regents, 824 F.3d 858, 865 (9th Cir. 2016); Wolfe, 392 F.3d at 365.

### 2.   City Entities

The City Entities do not argue that they are entitled to Eleventh Amendment immunity. Therefore, there are no Eleventh Amendment issues pertaining to the City Entities.

### 3.   County Entities

Courts routinely deny Eleventh Amendment immunity to municipal corporations such as counties.  Lake County Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979); Ray v. County of L.A., 935 F.3d 703, 708 (9th Cir. 2019); Del Campo v. Kennedy, 517 F.3d 1070, 1075-76 (9th Cir. 2008).  However, there is an unsettled issue, recognized but undecided by the Ninth Circuit, whether a county may obtain Eleventh Amendment immunity if the county acts as "an arm of the State."  Ray, 935 F.3d at 708 (discussing Northern Ins. Co. of N.Y. v. Chatham Cnty., 547 U.S. 189, 190 (2006)).  If a county can obtain Eleventh Amendment immunity as an arm of the State, whether a county is actually acting as an arm of the State is determined by examining five factors (known as the *Mitchell* factors):  (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only the name of the state; and (5) the corporate status of the entity.  Ray, 935 F.3d at 709; Sato v. Orange Cnty Dept. of Educ., 861 F.3d 923, 929 (9th Cir. 2017); Mitchell v. Los Angeles Cnty Community College Dist., 861 F.2d 198, 201 (9th Cir. 1988).  The first factor is the most important.  Ray, 935 F.3d at 709-10; Sato, 861 F.3d at 929.  Additionally, the second factor has two components:  (1) whether a matter is of statewide and not local concern, and (2) the extent to which the state exercises centralized government control over the performance of the particular function at issue.  Ray, 935 F.3d at 710.

Here, the County's argument boils down to three propositions:  (1) it is helpless to relax the State's emergency orders and most follow them; (2) *Mitchell* does not/should not apply in the

context of public health orders; and (3) even though California would likely not indemnify the County for a money judgment, the second factor tips the scales sharply in the County's favor because it has no discretion but to follow the orders.  The Court is not convinced.

The Court recognizes that the emergency orders issued in this case are unique and involve public health.  However, the County cites no authority that the Court can disregard or fail to apply the *Mitchell* factors.  In the Ninth Circuit, *Mitchell* is the test for determining "arm of the State" status.  This Court is bound by *Mitchell* and its progeny.  Without more, it is for the Ninth Circuit, not this Court, to establish exceptions.  Therefore, the Court will apply *Mitchell*.

With respect to the first factor, the County Entities do not contend that the State would indemnify them for a monetary award in this case.  In the absence of any indication that the State, and not the County, would pay a monetary award, the first *Mitchell* factor weighs against the County.  See Ray, 935 F.3d at 709-10.

With respect to the third, fourth, and fifth *Mitchell* factors, the County does not argue that it cannot sue or be sued, that it cannot own property in its own name, or that it does not have an independent corporate status.  Thus, these three factors weigh against the County.  Id. at 711.

With respect to the second *Mitchell* factor, this consideration is similar to the analysis in *Ray*.  First, the statewide spread of Covid 19 and the efforts to limit its adverse impact are clearly matters of statewide importance.  However, the Plaintiffs all reside in Fresno County, and the County also has an interest in stemming the spread and adverse effects of Covid 19 within Fresno County.  Cf. id. at 710 (noting dual interests in a statewide program that was implemented and run through the state and counties).  Second, the emergency orders are effective statewide and are issued through Gov. Newsom.  Plaintiffs do not identify any discretionary powers or substantial autonomy that the County has in carrying out, modifying, or opting out of the emergency orders.  Without more from Plaintiffs, the Court concludes that the County is mandated by the State to follow the emergency orders.  Therefore, the second *Mitchell* factor favors the County.  Cf. id. (finding that a county had no choice but to follow state mandated rules and that the second *Mitchell* factor favored Eleventh Amendment immunity as a result).

From the above, four of the *Mitchell* factors weigh against the County, including the most

important *Mitchell* factor.  Only the second *Mitchell* factor weighs in favor of immunity.
Admittedly, the Court believes that the second *Mitchell* factors weighs strongly in the County's
favor.  However, this was the same calculus that was involved in *Ray*, and the Ninth Circuit held
that Los Angeles County was not an arm of the State.  See id. at 713.  *Ray* noted that no cases had
extended "arm of the State" status to a county, see id. at 708 n.5, and the County has cited none.
Given the analysis in *Ray*, the Court will not be first.  Because the Court concludes that the second
*Mitchell* factor does not outweigh the remaining four factors, the County Entities are not entitled
to Eleventh Amendment immunity.  See id. at 708-13.

### B.    Individual Capacity Liability against Mayor Brand

The City Entities argue that Mayor Brand cannot be held individually liable for any Fifth
Amendment takings claim.  This is a non-issue for two reasons.  First, and most fundamentally,
the FAC specifically states that Mayor Brand is sued in his official capacity, it does not state that
he is being sued in his individual capacity.  See FAC ¶ 17.  Second, the City Entities' argument is
supported by citation to a published Sixth Circuit case and two unpublished district court cases
from the Central District of California.  Plaintiffs do not respond to this argument or expressly
contend that Mayor Brand can be held individually liable for a Fifth Amendment takings violation.
The Court takes Plaintiffs' failure to respond to the City Entities' argument as further support for
the conclusion that the FAC does not allege individual liability against Mayor Brand.  Cf.
Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.  Therefore, there are no plausible individual
liability claims against Mayor Brand.

### C.    *Jacobson v. Massachusetts* & the Standard for Public Health Emergencies

There is a disagreement between the parties about the proper standard for evaluating the
constitutional claims.  At the center of the disagreement is *Jacobson v. Massachusetts*, 197 U.S.
11 (1905).  In that case, the State of Massachusetts passed a law permitting cities to require
vaccinations.  The City of Cambridge required every adult to be vaccinated for smallpox.  The
plaintiff refused the vaccination and was prosecuted; the punishment was a monetary fine.  The
plaintiff challenged the conviction, arguing that the law was unreasonable, arbitrary, and
oppressive.  The U.S. Supreme Court upheld the law.  In particular, the opinion states:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

Jacobson v. Massachusetts, 197 U.S. 11, 31 (1905).  This wording is suggestive of an alternative standard for reviewing laws addressing a public health emergency.

Defendants assert that *Jacobson* sets out a standard that is different than "ordinary constitutional standards." Doc. 15, 10:23-24.  Some courts have adopted that position: "Plaintiff must do more than establish an infringement of its rights, for as this Court has previously explained, 'Defendants have a right to protect California residents from the spread of COVID-19 — even if those protections temporarily burden constitutional rights to a greater degree than normally permissible.' Rather than being subject to normal constitutional analysis, Defendants' Orders warrant the deference necessary to reflect the principle that '[t]he legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases.'" PCG-SP Venture I LLC v. Newsom, 2020 WL 4344631, at *4 (C.D. Cal. June 23, 2020) (citing Gish v. Newsom, 2020 WL 1979970, at *4 (C.D. Cal. Apr. 23, 2020) and Jacobson, 197 U.S. at 905).  The Fifth Circuit has stated that "individual rights secured by the Constitution do not disappear during a public health crisis, but the [Supreme] Court plainly stated that rights could be reasonably restricted during those times….when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" In re Abbott, 954 F.3d 772, 784 (5th Cir. April 7, 2020) (citing Jacobson, 197 U.S. at 31).  Plaintiffs disagree with the assertion that "a more deferential standard of review should apply during a period of crisis or emergency.  *Jacobson* stands for no such thing." Doc. 23, 9:8-10.

In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Supreme Court applied a traditional strict scrutiny analysis to strike down Covid related restrictions relating to places of religious worship.  In concurrence, Justice Gorsuch commented on the difference in the interpretation of

1  *Jacobson*:

> *Jacobson* hardly supports cutting the Constitution loose during a pandemic. That decision involved an entirely different mode of analysis, an entirely different right, and an entirely different kind of restriction.

> Start with the mode of analysis. Although Jacobson pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review to Henning Jacobson's challenge to a state law that, in light of an ongoing smallpox pandemic, required individuals to take a vaccine, pay a $5 fine, or establish that they qualified for an exemption. Rational basis review is the test this Court normally applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right. Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue— exactly what the Court does today.

10  Roman Catholic Diocese of Brooklyn v. Cuomo, 208 L.Ed.2d 206, 212-13 (Nov. 25, 2020)

11  (Gorsuch J., concurring).  Chief Justice Roberts also recently cited to *Jacobson*, but only for the

12  limited proposition that "Our Constitution principally entrusts '[t]he safety and the health of the

13  people' to the politically accountable officials of the States 'to guard and protect.'"  Roman

14  Catholic Diocese of Brooklyn, 208 L.Ed.2d at 219 (Nov. 25, 2020) (Roberts, C.J. dissent); South

15  Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1614 (May 29, 2020) (Roberts, C.J.

16  concurring).

17  Based on the recent U.S. Supreme Court precedent of *Roman Catholic Diocese of*

18  *Brooklyn*, the concurrence of Justice Gorsuch, and even the concurring opinion (in *South Bay*

19  *United*) and dissenting opinion (in *Roman Catholic Diocese*) of Chief Justice Roberts, this Court

20  concludes that the normal constitutional standards of review should apply, not a separate

21  "*Jacobson* standard."  A public health emergency does not give rise to an alternative standard of

22  review.

23  **D.     Fifth Amendment Takings Claim**

24  "The Fifth Amendment's Takings Clause prohibits the taking of 'private property . . .  for

25  public use, without just compensation.'"  Sierra Med. Servs. Alliance v. Kent, 883 F.3d 1216,

26  1223 (9th Cir. 2018) (quoting U.S. Const. amend. V).  "A Takings Clause claim requires proof

27  that the plaintiff 'possess a 'property interest' that is constitutionally protected.'"  Id. (quoting

28  Turnacliff v. Westly, 546 F.3d 1113, 1118 (9th Cir. 2008)).  The Ninth Circuit has recently

explained the contours of Fifth Amendment takings claims:

> By its terms, the clause "does not prohibit the taking of private property," but instead requires "compensation in the event of [an] otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304, 314, 315 (1987). A classic taking occurs when the "government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 539 (2005).
>
> Beyond a classic taking, the Supreme Court has recognized that "if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). There are three types of regulatory action the Court has recognized, "each of which 'aims to identify regulatory actions that are functionally equivalent to the classic taking.'" Cedar Point Nursery v. Shiroma, 923 F.3d 524, 530-31 (9th Cir. 2019) (quoting Lingle, 544 U.S. at 539). Two types of regulatory actions—Loretto and Lucas takings—are per se takings. Id. at 531. Penn Central takings are the third type of regulatory taking. Id.
>
> Generally, courts determine whether a regulatory action is functionally equivalent to the classic taking using "essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002). These inquiries are set forth in the three Penn Central factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." Penn Central, 438 U.S. at 124.
>
> Certain regulatory actions, however, are treated categorically as a taking without the necessity of the Penn Central inquiry. The Lucas rule "applies to regulations that completely deprive an owner of 'all economically beneficial us[e]' of her property." Lingle, 544 U.S. at 538 (alteration in original) (quoting Lucas, 505 U.S. at 1019). Government regulations that constitute such a taking are typically those that require land to be left substantially in its natural state. Lucas, 505 U.S. at 1018. This is a "relatively narrow" and relatively rare taking category, Lingle, 544 U.S. at 538, confined to the "extraordinary circumstance when no productive or economically beneficial use of land is permitted," Lucas, 505 U.S. at 1017. Compensation is required in such a case unless the government can show that underlying principles of state property or nuisance law would have led to the same outcome as the challenged regulation. See Tahoe-Sierra, 535 U.S. at 330; Lucas, 505 U.S. at 1029.

Bridge Aina Le'a, LLC v. State Land Use Comm'n, 950 F.3d 610, 625-26 (9th Cir. 2020). "A Loretto taking occurs 'where government requires an owner to suffer a permanent physical invasion of her property." Lingle, 544 U.S. at 538 (citing Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982)); Bridge Aina Le'a, 950 F.3d at 625 n.6. A Loretto taking is a per se taking and relatively narrow; it requires the government to provide compensation, no matter how minor the physical invasion. Bridge Aina Le'a, 950 F.3d at 625 n.6 (citing Lingle, 544 U.S. at 538).

1    Here, there are several problems with the takings cause of action.

2    First, the FAC alleges that the regulations at issue effected a physical occupation of private

3 property.  See FAC ¶ 101.  The entirety of the FAC makes this allegation implausible.  A physical

4 taking occurs "when the government physically takes possession of an interest in property for

5 some public purpose."  Buffalo Teachers Fed'n v. Tobe, 464 F.3d 362, 374 (2d Cir. 2006); see

6 Tahoe-Sierra, 535 U.S. at 321-22; Rancho De Calistoga v. City of Calistoga, 800 F.3d 1083, 1088

7 (9th Cir. 2015).  The FAC alleges no actual physical occupation by any governmental entities of

8 any of Plaintiffs' respective businesses.  It is clear that the source of any takings claim is the

9 emergency orders issued by the State Entities and the City Entities.  The emergency orders curtail

10 certain uses of the businesses/properties, the orders do not deprive any Plaintiff of actual physical

11 occupancy.  Thus, the FAC plainly describes a regulatory taking.  See Bridge Aina Le'a, 950 F.3d

12 at 625; Rancho De Calistoga, 800 F.3d at 1088-89.  The "longstanding distinction between

13 acquisitions of property for public use, on the one hand, and regulations prohibiting private uses,

14 on the other, makes it inappropriate to treat cases involving physical takings as controlling

15 precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa."

16 Tahoe-Sierra, 535 U.S. at 323; Rancho De Calistoga, 800 F.3d at 1092.  Based on the FAC's

17 allegations, this is only a regulatory takings case.  There is no plausible "physical taking" alleged

18 and dismissal of such a claim is appropriate.

19    Second, to the extent that Plaintiffs seek declaratory or injunctive relief under the takings

20 claim, such relief is inappropriate.   "Equitable relief is not available to enjoin an alleged taking of

21 private property for a public use, duly authorized by law, when a suit for compensation can be

22 brought against the sovereign subsequent to the taking."  Ruckelshaus v. Monsanto Co., 467 U.S.

23 986, 1016 (1984); In re Nat'l Sec. Agency Telecomm. Records Litig., 669 F.3d 928, 932 (9th Cir.

24 2011); see also Xponential Fitness v. Arizona, 2020 U.S. Dist. LEXIS 123379, *27 (D. Ariz. July

25 14, 2020); Bridge Aina Le'a, LLC v. State of Hawaii Land Use Comm'n, 125 F.Supp.3d 1051,

26 1066 (D. Haw. 2015).  That is, "[a]s long as an adequate provision for obtaining just compensation

27 exists, there is no basis to enjoin the government's action effecting a taking."  Knick v. Township

28 of Scott, Pa., 139 S. Ct. 2162, 2176 (2019).  With respect to the State Entities, there is no

1    indication or suggestion that California does not provide just compensation to property owners for

2    a taking, particularly given the existence of Article 1, Section 19 of the California Constitution.

3    Because there is no indication that just compensation cannot be had by Plaintiffs, the takings claim

4    cannot form the basis for equitable relief against the State Entities.  In re Nat'l Sec. Agency, 669

5    F.3d at 932.  This conclusion forecloses operation of *Ex parte Young* with respect to the State

6    officials.  With respect to the City and County Entities, just compensation can be obtained in

7    federal and state court.  See Knick, 139 S.Ct. at 2176.  Therefore, the takings claim cannot form

8    the basis for equitable relief against the City and County Entities.  In re Nat'l Sec. Agency, 669

9    F.3d at 932.

10           Third, the orders do not deprive the Plaintiffs of *all* beneficial use of the property[8] or

11   establish a permanent physical invasion, thus this case is not governed by either *Lucas* or *Loretto*.

12   Therefore, this case is governed by *Penn Central*.  See Hotop v. City of San Jose, 982 F.3d 710,

13   714 (9th Cir. 2020).  An inquiry under *Penn Central* is ad hoc and fact intensive and requires a

14   careful examination and weighing of all relevant circumstances.  Tahoe-Sierra, 535 U.S. at 322;

15   Rancho De Calistoga, 800 F.3d at 1089.  The Supreme Court in *Penn Central* indicated that any

16   inquiry should include consideration of three factors:  (1) economic impact of the regulation on the

17   claimant; (2) the extent to which the regulation interferes with distinct investment backed

18   expectations; and (3) the character of the government action.  Penn Central Transp. Co. v. New

19   York City, 438 U.S. 104, 124 (1978); Hotop, 982 F.3d at 714; Bridge Aina Le'a, 950 F.3d at 625.

20           Here, the takings claim incorporates all 96 paragraphs that proceeded it without distinction.

21   This is an improper shotgun pleading technique that does not give proper notice to either the

22   Defendants or the Court.  See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313,

23   1321-23 (11th Cir. 2015); Deerpoint Grp., Inc. v. Agrigenix, LLC, 345 F.Supp.3d 1207, 1234 n.15

24   (E.D. Cal. 2018).  If there are specific paragraphs that support a takings claim and that the

25   Plaintiffs intend to rely on, then those paragraphs, not the wholesale incorporation of every

26   paragraph, should be specifically incorporated by reference (e.g. "Plaintiffs incorporate paragraphs

27

28   _____
     [8] Plaintiffs may still provide take out dining from their restaurants, and gyms can conduct outdoor classes (although it is now winter).

15-24, 27, 38 and 41-45 as if fully set forth herein.").  The specific allegations under the takings claim do not adequately address *Penn Central*.  Unless the allegations support *Penn Central* considerations, there is no plausible takings claim against the City Entities or the County Entities.[9] Additionally, the City raised *Penn Central* concerns, but there is no attempt by Plaintiffs to defend the claim under *Penn Central*.  The failure by Plaintiffs to defend their takings claim can be viewed as either a concession that no plausible claim has been alleged or possibly abandonment of the claim.  Cf. Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.

In sum, the Fifth Amendment Takings Clause is not a basis for equitable injunctive relief, and the FAC does not allege a plausible takings claim.  Plaintiffs' failure to defend this claim indicates a recognition that no plausible claim is alleged or abandonment, which suggests that leave to amend need not be given.  However, leave to amend is the general rule, even if no request for leave to amend is made.  See Hoang v. Bank of Am., N.A., 910 F.3d 1096, 1102-03 (9th Cir. 2018); Ebner, 838 F.3d at, 962.  In the absence of a more in depth discussion of the *Penn Central* considerations by the parties, although the Court has reservations, the Court will follow the general rule and permit amendment because it is not sufficiently clear that amendment would be futile.

## E.    Fifth Amendment "Non-Takings" Claims

The Complaint expressly alleges claims under the Fifth Amendment Due Process and Equal Protection Clauses.  Dismissal of these claims is appropriate for two reasons, one procedural and one substantive.  First, the "Due Process Clause of the Fifth Amendment and the equal protection component thereof apply only to actions of the federal government – not to those of state or local governments."  Lee v. City of L.A., 250 F.3d 668, 687 (9th Cir. 2001); Sanchez v. City of Fresno, 914 F.Supp.2d 1079 1098 (E.D. Cal. 2012); see also Bingue v. Prunchak, 512 F.3d 1169, 1174 (9th Cir. 2008).  No Defendant is a federal entity.  Second, although the City Entities challenged these Fifth Amendment claims, Plaintiffs did not respond to the arguments or defend the claims.  In light of *Lee*, Plaintiffs' failure to respond can be viewed as conceding the City

---

[9] Again, through operation of Eleventh Amendment immunity and the inapplicability of *Ex parte Young*, there is not a viable Fifth Amendment takings claim against the State Entities.

Entities' arguments.  See Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.  Therefore, dismissal without leave to amend of Plaintiffs Fifth Amendment due process and equal protection claims is appropriate.

### F.      Fourteenth Amendment Due Process

Plaintiffs' allegations do not make clear exactly what rights have been violated.  The FAC is plead broadly: "As a free people, we have the unalienable right to pursue happiness, which includes the freedom to make our own choices about our safety and welfare without unconstitutional interference. In the face of the coronavirus, it means the freedom to choose whether to stay at home, or to keep calm and carry on with the things that make life worth living." Doc. 8, 3:11-15.  As discussed above, shotgun pleading does not give proper notice to either the Defendants or the Court.  See Weiland, 792 F.3d at 1321-23.  Plaintiffs directly, and more specifically, state that "Plaintiffs, and all others similarly situated, are affected by the Governor's and Mayor's orders. Under threat of criminal penalties, they have been forced to close 'indoor dining,' and other indoor activities engaged in by the Plaintiffs, depriving of their liberty and property interests without due process." Doc. 8, 3:27-4.  Plaintiffs' due process claims are understood to be based only on the restrictions on indoor business activities.

#### 1.      Procedural Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property [without due process of law]; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 545 U.S. 209, 221 (2005).  Therefore, to state a claim for violation of procedural due process under Section 1983, a plaintiff must allege facts showing: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." Tutor–Saliba Corp. v. City of Hailey, 452 F.3d 1055, 1061 (9th Cir. 2006) (citations omitted).

Plaintiffs assert that "Governor Newsom did not provide any procedural due process before issuing the executive shutdown Orders. Nor do the shutdown Orders provide any mechanism for post-deprivation review." Doc. 8, 15:23-25.  For procedural due process, Plaintiffs explain that their "protected liberty and property interests" are "the right to intrastate travel and the

right to engage in commerce, to-wit: operating indoor dining in their restaurants and bars." Doc. 8, 15:15-19.

Regarding the second element (of adequate procedural protections):[10]

'Ordinarily, due process of law requires [notice and] an opportunity for some kind of hearing prior to the deprivation of a significant property interest.' However, 'when the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law.'

In seeking to define when a particular governmental action is 'legislative in nature' we have eschewed the 'formalistic distinctions between "legislative" and "adjudicatory" or "administrative" government actions' and instead focused on the 'character of the action, rather than its label…' In doing so, our cases have determined also that governmental decisions which affect large areas and are not directed at one or a few individuals do not give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient.

Halverson v. Skagit Cnty., 42 F.3d 1257, 1260-61 (9th Cir. 1994) (citations omitted).  In other suits challenging the State of California's Covid 19 restrictions, courts have found that California's actions are legislative in nature because they "affect all citizens of California and at their most particular direct restrictions towards nationwide groups and classes of individuals and businesses." Pcg-Sp Venture I LLC v. Newsom, 2020 U.S. Dist. LEXIS 137155, at *25 (C.D. Cal. June 23, 2020) (plaintiff hotel challenging business restrictions); Six v. Newsom, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020) (natural persons challenging the restrictions that apply to individuals).  Although cited and heavily relied upon by the State Entities and the City Entities, Plaintiffs do not address Halverson or application of Halverson's reasoning to this case.  Cf. Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.  Because the Court concludes that Defendants' challenged actions are legislative in nature, Plaintiffs have not stated a valid procedural due process claim.  Halverson, 42 F.3d at 1260-61; Six, 462 F.Supp.3d at 1073.

2.    Substantive Due Process

"Substantive due process forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.'" Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009), citations

---

[10] Because the Court finds that the second element is dispositive, the Court declines to address the first element.

27

omitted.  The theory underlying substantive due process, as distinct from procedural due process, is that "by barring certain government actions regardless of the fairness of the procedures used to implement them, it serves to prevent governmental power from being 'used for purposes of oppression.'" Daniels v. Williams, 474 U.S. 327, 331 (1986) (quoting Den Ex Dem. Murray v. Hoboken Land & Improv. Co., 59 U.S. 272, 277 (1856)).  "A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution." Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz., 24 F.3d 56, 62 (9th Cir. 1994) (citing Board of Regents v. Roth, 408 U.S. 564, 569 (1972) and Kraft v. Jacka, 872 F.2d 862, 866 (9th Cir.1989)).  Once that threshold is met, "[s]ubstantive due process cases typically apply strict scrutiny in the case of a fundamental right and rational basis review in all other cases. When a fundamental right is recognized, substantive due process forbids the infringement of that right 'at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" Witt v. Dep't of Air Force, 527 F.3d 806, 817 (9th Cir. 2008) (quoting Reno v. Flores, 507 U.S. 292, 302 (1993)).  When the action does not infringe a fundamental right "the statute need only bear a 'reasonable relation to a legitimate state interest to justify the action.'" United States v. Juvenile Male, 670 F.3d 999, 1012 (9th Cir. 2012) (quoting Washington v. Glucksberg, 521 U.S. 702, 722 (1997)).

With respect to the restrictions, Plaintiffs claim, "The Executive Shutdown Orders shock the conscience and interfere with Plaintiffs' and members of the putative Class's deeply-rooted liberty and property rights, including the right to work, right to contract, and right to engage in commerce." Doc. 8, 17:19-22.  In their motions to dismiss, Defendants have interpreted this language as asserting a right to pursue a particular kind of work. See Doc. 15, 13:24-14:16 ("liberty interest in pursuing one's calling"); Doc. 16-1, 9:24-10:7 ("right to pursue particular work").  In opposition, Plaintiffs do not discuss what specific rights have been violated, stating instead that "Defendants' Orders, which expressly (1) deprive Plaintiffs of their right to personal exercise of their constitutional rights and freedoms and (2) deny Plaintiffs of their rights and liberties in lawfully operating their businesses by ordering the closure of 'Non-Essential' businesses, did not afford Plaintiffs with a constitutionally adequate hearing to present their case

for their businesses to not be shut down." Doc. 23, 13:17-22.  Plaintiffs have not provided

argument that the Defendants' framing of the right in question is incorrect.  Thus, the analysis will

be confined to that topic. Cf. Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.

"[T]he Supreme Court stated that 'the Fourteenth Amendment's Due Process Clause

includes some generalized due process right to choose one's field of private employment.'…. the

Court has never held that the right to pursue work is a fundamental right. The Court has stated that

the 'generalized' right to choose one's employment 'is nevertheless subject to reasonable

government regulation.'" Sagana v. Tenorio, 384 F.3d 731, 742–43 (9th Cir. 2004) (quoting Conn

v. Gabbert, 526 U.S. 286, 291–92 (1999)).  The Ninth Circuit has emphasized that such a right has

only been recognized when there is "a complete prohibition of the right to engage in a calling"

rather than a "brief interruption" of that right. Guzman v. Shewry, 552 F.3d 941, 954 (9th Cir.

2009); Conn, 526 U.S. at 292 (no violation when attorney claimed his right to work was curtailed

when "the prosecutors executed a search warrant at the same time his client was testifying before

the grand jury").  In *Guzman*, the Ninth Circuit found no substantive due process violation when a

doctor was temporarily suspended from participation in California's Medi-Cal program pending

the completion of a billing fraud investigation, reasoning that the doctor could still practice his

profession as there was no "revo[cation] or suspen[sion of] his license to practice medicine."

Guzman, 552 F.3d at 954.  "Accordingly, Guzman has not been deprived of a protected liberty

interest in pursuing the occupation of his choice." Guzman, 552 F.3d at 955.

In this case, Plaintiffs are challenging the Defendants' actions that have restricted indoor

business activities.  The restrictions on Plaintiffs' businesses have lasted for approximately 10

months, much longer than the single day interruption discussed in *Conn*.  However, the restrictions

have not been complete.  According to the documents submitted by the State Entities, California's

"Blueprint for a Safer Economy" placed each county into a four tier framework for determining

what kinds of activities are restricted. Doc. 15-1, Ex. 9, pages 43-44 of 67.  Whether indoor

business activities are permitted depends on the tier the county is in; the most restrictive purple

tier does not allow any indoor business activities for restaurants and fitness centers but does allow

outdoor operations. Doc. 15-1, Ex. 11, pages 58-59 of 67 ("Outdoor Only with modifications").

Additionally, the State Entities argue that "carryout" and "virtual classes" are also available to Plaintiffs. Doc. 15, 14:9-11.  In this way, the restrictions are closer to those of *Guzman*.  From what can be gathered, Plaintiffs are still able to operate their businesses but in a significantly reduced capacity.  In *Guzman*, the doctor was similarly allowed to continue practicing medicine, but with the restriction that he could no longer treat and collect fees from Medi-Cal patients. Following the precedent of *Guzman*, Plaintiffs have not met the threshold step of asserting a liberty or property interest protected by the U.S. Constitution has been violated.

Even assuming arguendo that such protected interests was at stake, any restrictions would be held to rational rather than heightened review.  Under this less exacting standard, "the law in question needs only some rational relation to a legitimate state interest." Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir. 1990).  "When reviewing the substance of legislation or governmental action that does not impinge on fundamental rights, moreover, we do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did."  Wedges/Ledges, 24 F.3d at 66; see F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) ("because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature…. In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").  "Under the rational-basis standard, we accept 'generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.'" United States v. Navarro, 800 F.3d 1104, 1114 (9th Cir. 2015) (quoting Heller v. Doe ex rel. Doe, 509 U.S. 312, 321 (1993)).

The overall rationale and framework for the tiers is partially explained as follows:

Risk Criteria

Activities and sectors will begin to open at a specific tier based on risk-based criteria (PDF), as outlined below.  Lower risk activities or sectors are permitted sooner and higher risk activities or sectors are not permitted until later phases.

Many activities or sectors may increase the level of operations and capacity as a county reduces its level of transmission.

Criteria used to determine low/medium/high risk sectors

Ability to accommodate face covering wearing at all times (e.g. eating and drinking would require removal of face covering)

Ability to physically distance between individuals from different households

Ability to limit the number of people per square foot

Ability to limit duration of exposure

Ability to limit amount of mixing of people from differing households and communities

Ability to limit amount of physical interactions of visitors/patrons

Ability to optimize ventilation (e.g. indoor vs outdoor, air exchange and filtration)

Ability to limit activities that are known to cause increased spread (e.g. singing, shouting, heavy breathing; loud environs will cause people to raise voice)

Doc. 15-1, Ex. 9, pages 47-48 of 67.  These restrictions are rationally related to the goal of preventing the spread of Covid 19, a respiratory illness.  "The science suggests that for indoor operations the odds of an infected person transmitting the virus are dramatically higher compared to an open-air environment.  Thus, for those counties on the list, it is necessary to close indoor operations for additional sectors which promote the closed-space mixing of populations beyond households and/or make adherence to physical distancing with face coverings difficult." Doc. 16-4, Ex. J, page 7 of 146.  The City Entities directly explain that "Limiting in-person interactions, where possible, mitigates the spread of COVID-19. The City Defendants have a strong interest in stopping the spread of COVID-19 and have chosen to temporarily close the indoor activities of certain businesses to achieve this goal." Doc. 24, 5:10-13.  Based on the judicially noticed materials, the Defendants have provided legitimate justification for the restrictions on indoor business activities.

### 3. Equity Metric

In the opposition, Plaintiffs raised the use of an "equity metric":

Because Defendants' decisions in issuing their Orders were made in reliance on procedurally deficient and substantively unlawful processes, Plaintiffs were directly and proximately deprived of their property, and consequently, their ability to lawfully operate their businesses without unconstitutional government overreach.

1
2
3
4
5

> A major example of this being the new color-coded system [which] was unveiled at a press conference and little to no information was provided regarding the data that the state used in coming up with the latest criteria.  Specifically, the 'equity metric.'  This metric depends on such things as voter turnout and 'clean environment.'  The state's new 'health equity' score calculates separate positive test rate for census tracts in each county that score the lowest on the California healthy places index, a classification system that uses a range of socio economic statistics to pinpoint the location of the most and least disadvantage neighborhoods.  What does this have to do with rationally dealing with a virus while destroying peoples constitutional rights.

6   Doc. 23, 14:4-16.  Defendants do not address Plaintiffs' argument in their replies.  Plaintiffs have

7   not explained how the "equity metric" is used or how it impacts the restrictions on indoor business

8   activities.  As Plaintiffs have not stated a claim for violation of the right to pursue a particular kind

9   of work based on Defendants' restriction of indoor business activities, the Court need not address

10  whether use of this metric is rationally related to a legitimate state interest at this time.  However,

11  as discussed below, Plaintiffs will be given the opportunity to include clarifying allegations about

12  the equity metric as part of a due process claim in an amended complaint.

13                          4.      Leave to Amend

14          The Court has concluded that no plausible Fourteenth Amendment due process claims are

15  pled.  With respect to procedural due process, because the emergency orders at issue are

16  legislative in nature, the Court concludes that no plausible claim can be stated and amendment

17  would be futile.  Therefore, the procedural due process claim will be dismissed without leave to

18  amend.  With respect to substantive due process, the FAC and the briefing tended to be general in

19  nature and did not necessarily address or resolve all relevant issues in a definitive manner.  As

20  with the Takings Claim, the Court has reservations that amendment can cure the defects discussed

21  above.  Nevertheless, leave to amend is the general rule even when not requested.  Hoang, 910

22  F.3d at 1102-03; Ebner, 838 F.3d at, 962  Because the Court cannot definitively say at this time

23  that amendment would be futile, the Court will follow the general rule and permit Plaintiffs to

24  amend their substantive due process claim.

25          **G.      Fourteenth Amendment Equal Protection**

26          In the FAC, the specific allegations with regards to the Fourteenth Amendment equal

27  protection claim state, "Under Governor Newsom's executive orders, Plaintiffs' businesses must

28  remain closed for indoor operations while businesses just hours away can open for indoor

1  operations.  This designation is completely arbitrary, random and ridiculous." Doc. 8, 19:9-12.

2  "There is absolutely NO SCIENCE that will prove that 'indoor dining' and other indoor activities

3  engaged in by the Plaintiffs, is safer three hours away from Fresno in Huntington Beach or a

4  multitude of other places in California, which have been allowed to remain open, while Fresno

5  businesses have been forced to close." Doc. 8, 3:21-27.  Plaintiffs also allege that their rights to

6  equal protection under the California Constitution are violated as well: "By classifying businesses

7  into essential v. Non-essential, the State is treating like businesses differently." Doc. 8, 20:6-8.  As

8  with due process, the gravamen of the equal protection claim is understood to be based only on the

9  restrictions on indoor business activities.

10        "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

11  'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a

12  direction that all persons similarly situated should be treated alike." Serrano v. Francis, 345 F.3d

13  1071, 1081 (9th Cir. 2003) (citations omitted).  "Generally, legislation is presumed to pass

14  constitutional muster and will be sustained if the classification drawn by the statute or ordinance is

15  rationally related to a legitimate state interest. If the classification disadvantages a 'suspect class'

16  or impinges a 'fundamental right,' the ordinance is subject to strict scrutiny." Nunez by Nunez v.

17  City of San Diego, 114 F.3d 935, 944 (9th Cir. 1997) (citing City of Cleburne v. Cleburne Living

18  Ctr., Inc., 473 U.S. 432, 439–40 (1985) and Plyler v. Doe, 457 U.S. 202, 216–17 (1982)).  A

19  suspect class is often defined as a group "saddled with such disabilities, or subjected to such

20  history of purposeful unequal treatment, or relegated to such a position of powerlessness as to

21  command extraordinary protection from the majoritarian political process." Owens v. Ventura

22  Cnty. Superior Court, 42 F. Supp. 2d 993, 998 (C.D. Cal. 1999) (quoting San Antonio Indep. Sch.

23  Dist. v. Rodriguez, 411 U.S. 1, 28 (1973)).

24        Plaintiffs have raised two distinctions: Fresno vs. non-Fresno businesses and essential vs.

25  non-essential businesses.  Businesses in Fresno are not a suspect class as they have not been

26  subject to such disadvantages that suggest they require special protection from the political

27  process.  Similarly, businesses termed non-essential are not a suspect class.  As discussed above,

28  the indoor business activity restrictions do not implicate anything that can be termed a

1  fundamental right.  Thus, the proper standard is rational review.

2         Under this standard, "the Equal Protection Clause is satisfied so long as there is a plausible

3  policy reason for the classification, the legislative facts on which the classification is apparently

4  based rationally may have been considered to be true by the governmental decisionmaker, and the

5  relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary

6  or irrational." Nordlinger v. Hahn, 505 U.S. 1, 11 (1992) (citations omitted).  Similar to rational

7  review under substantive due process, "This is a very deferential standard and precludes judges

8  from second-guessing Congress's 'wisdom, fairness, or logic of legislative choices.' Rather, courts

9  must uphold a classification against an equal protection challenge so long as any reasonably

10  conceivable facts might provide a rational basis for the classification. Courts must accept

11  Congress's generalizations even when means and ends do not fit perfectly together. A

12  classification will not fail rational-basis review even if 'it is not made with mathematical nicety or

13  because in practice it results in some inequality.'" United States v. Pickard, 100 F. Supp. 3d 981,

14  1005 (E.D. Cal. 2015) (citing Heller v. Doe by Doe, 509 U.S. 312, 319 (1993)).

15         First, as discussed above, "The science suggests that for indoor operations the odds of an

16  infected person transmitting the virus are dramatically higher compared to an open-air

17  environment.  Thus, for those counties on the list, it is necessary to close indoor operations for

18  additional sectors which promote the closed-space mixing of populations beyond households

19  and/or make adherence to physical distancing with face coverings difficult." Doc. 16-4, Ex. J,

20  page 7 of 146.  The State Entities explain that "Counties with higher transmission rates, as

21  indicated by the case rate and the positivity rate, face greater restrictions than counties with lower

22  transmission rates."  Doc. 15, 15:20-21.  This reasoning explains why businesses in Fresno County

23  might be subject to more severe restrictions than businesses elsewhere in the state that have lower

24  transmission rates and consequently lower public health risk.

25         Second, there is some confusion between the parties about how essential and non-essential

26  businesses are being treated.  The State Entities explain that the current tier system promulgated

27  by the Blueprint "does not distinguish between 'essential' and 'nonessential' businesses; instead it

28  distinguishes between different activities and business sectors and imposes restrictions based upon

the relative risk they pose of spreading COVID-19." Doc. 15, 16:4-7.  The judicially noticed
document that seems to outline the current regulations makes no mention of essential or non-
essential activities. See Doc. 15-1, Ex. 9.  However, these two types of businesses were treated
differently in the past.  On March 16, 2020, as part of the initial response to Covid 19, the
California Department of Public Health issued restrictions with the caveat that "Certain activities
are essential to the functioning of our state and must continue.  Hence this does not apply to
essential public transportation, airport travel, shopping at a store, mall, or farmers' market, or
charitable food pantries and distributions." Doc. 15-1, Ex. 3, page 20 of 67.  On March 19, 2020,
California "direct[ed] all residents immediately to heed current State public health directives to
stay home, except as needed to maintain continuity of operations of essential critical infrastructure
sectors and additional sectors as the State Public Health Officer may designate as critical to protect
health and well-being of all Californians." Doc. 16-3, Ex. F, page 35 of 77.  On March 28, 2020,
the U.S. Department of Homeland Security issued guidance "to support state, local, tribal,
territorial and industry partners in identifying the critical infrastructure sectors and the essential
workers needed to maintain the services and functions Americans depend on daily and that need to
be able to operate resiliently during the COVID-19 pandemic response.  This document gives
advisory guidance on defining essential critical infrastructure workers.  Promoting the ability of
such workers to continue to work during periods of community restriction, access management,
social distancing, or closure orders/directives is crucial to community resilience and continuity of
essential functions." Doc. 16-3, Ex. E, page 22 of 77.  For the restaurant industry, "Restaurant
carry-out and quick serve food operations, including dark kitchen and food prep centers, and
carry-out and delivery food employees" were termed to be essential. Doc. 16-3, Ex. E, page 25 of
77.  California deem essential "Workers supporting restaurant carry-out and quick serve food
operations, including food preparation, carry-out and delivery food employees." Doc. 16-3, Ex. F,
page 41 of 77.  These documents explain the reasoning behind the early regulations that
distinguished between essential and non-essential businesses.  To deal with the pandemic,
businesses had to be greatly restricted except for those that were essential to the "continuity of
functions critical to public health and safety, as well as economic and national security." Doc. 16-

3, Ex. F, page 35 of 77.  As the City Entities point out, this distinction has been found to satisfy rational review: "Plaintiffs have not shown that the Stay at Home Order's designation between essential and non-essential businesses is 'beyond all question, a plain, palpable invasion' of the right to equal protection. The Stay at Home Order has a legitimate purpose—namely, curbing the spread of COVID-19. Additionally, the challenged designations between essential and non-essential businesses promote that purpose. At minimum, there are 'plausible, arguable, or conceivable' reasons for the State's designations." Prof'l Beauty Fed'n. of Cal. v. Newsom, 2020 U.S. Dist. LEXIS 102019, at *20-21 (C.D. Cal. June 8, 2020), quoting Jacobson, 197 U.S. at 31.

Again, the Court has significant reservations that amendment can cure the defects discussed.  However, the Court will follow the general rule and grant Plaintiffs leave to amend to clarify their equal protection claims.  Hoang, 910 F.3d at 1102-03; Ebner, 838 F.3d at, 962

## H.   State Law Claims

The FAC alleges that the emergency orders violate Article 1, Sections 1, 7, and 19 of the California Constitution.  Article 1, Section 1 protects Californians' right to pursue life, liberty, and happiness.  Article 1, Section 7 provides for Californians' right to due process and equal protection.  Article 1, Section 19 protects Californians from having their property seized for public purpose without just compensation.  However, the FAC only expressly seeks relief under Article 1, Section 7.

No party distinguishes between the federal constitutional claims and the state constitutional claims.  Therefore, for purposes of this motion, the Court will assume without deciding that the substantive analyses for the respective state and federal constitutional claims are identical.  The resolutions of the state constitutional claims are therefore the same as the federal constitutional claims.

## I.   Preliminary Injunction

The City Entities argue that the cause of action for a preliminary injunction is improper because a preliminary injunction is a remedy, not a standalone cause of action.  Dismissal of the cause of action is appropriate for two reasons.  First, the City Entities are correct.  A preliminary injunction is a cause of action that must be supported by a viable substantive cause of action.

TYR Sport Inc. v. Warnaco Swimwear, Inc., 679 F.Supp.2d 1120, 1141 n.13 (C.D. Cal. 2009).

Second, Plaintiffs do not respond to the City Entities' argument or contend that a preliminary

injunction is a stand-alone claim.  Cf. Warnshuis, 2020 U.S. Dist. LEXIS 107136 at *6 n.1.  While

the *cause of action* for a preliminary injunction will be dismissed, the *prayer* for a preliminary

injunction is unaffected.

**J.      Lumping Allegations Against the County Entities**

A plaintiff who sues multiple defendants must allege the basis of his claim against each

defendant to satisfy Federal Rule of Civil Procedure 8.  Flores v. EMC Mortg. Co., 997 F.Supp.2d

1088, 1103 (E.D. Cal. 2014); Gauvin v. Trombatore, 682 F. Supp. 1067, 1071 (N.D. Cal.

1988). That is, a pleading should "allege what role each Defendant played in the alleged

harm[.]" Inman v. Anderson, 294 F.Supp.3d 907, 919 (N.D. Cal. 2018). "Broad allegations against

numerous defendants are not specific enough to provide the defendants with notice of the

plaintiffs' allegations." Sheffield v. Orius Corp., 211 F.R.D. 411, 415 (D. Or. 2002).  Generally,

"[s]pecific identification of the parties to the activities alleged by the plaintiffs is required . . . to

enable [a] defendant to plead intelligently." Flores, 997 F.Supp.2d at 1103 (quoting Van Dyke

Ford, Inc. v. Ford Motor Co., 399 F.Supp. 277, 284 (D. Wis. 1975)); Gen-Probe, Inc. v. Amoco

Corp., 926 F. Supp. 948, 961 (S.D. Cal. 1996).  Therefore, complaints that lump defendants

together without adequately distinguishing claims and alleged wrongs among the defendants are

improper. See Inman, 294 F.Supp.3d at 919; Flores, 997 F.Supp.2d at 1103; Gen-Probe, 926 F.

Supp. at 961; Gauvin, 682 F. Supp. at 1071.

Here, the County Entities complain that there are no allegations that are directed

specifically against them and that they are simply lumped together with all other Defendants.  The

Court agrees.  There are multiple Defendants in this case, essentially City, County, and State

entities.  Throughout the FAC, Plaintiffs make allegations against all Defendants without

necessarily distinguishing the particular improper and injurious conduct of the County Entities.  In

some circumstances, "lumping" all Defendants together is not necessarily improper.  See

Warnshuis v. Bausch Health U.S., LLC, 2020 U.S. Dist. LEXIS 2311471, *15-*17 & n.6 (E.D.

Cal. Dec. 8, 2020).  However, the FAC's lumping allegations are not limited to such

circumstances.  Plaintiffs should know what conduct the County Entities engaged in that caused them harm, be it creation, enforcement, or creation and enforcement of improper emergency orders.  More specificity is needed to distinguish claims and alleged wrongs among the Defendants, particularly the County Entities.  Therefore, in addition to the bases described above, dismissal of the claims against the County Entities because of improper lumping is appropriate.[11]

## V.   ORDER

Accordingly, IT IS HEREBY ORDERED that:

1.      Defendants' motions to dismiss (Doc. Nos. 15, 16, 17, and 20) are GRANTED;

2.      Plaintiffs' Fourteenth Amendment Substantive Due Process claim, Fourteenth Amendment Equal Protection claim, and Fifth Amendment Takings claim are DISMISSED WITH LEAVE TO AMEND, consistent with the analysis of this order;

3.      All other claims are DISMISSED WITHOUT LEAVE TO AMEND;

4.      No later than twenty-eight (28) days of service of this order, Plaintiffs may file an amended complaint that is consistent with the analysis of this  order;

5.      If Plaintiffs file a second amended complaint, Defendants shall file a response to the amended complaint within twenty-one (21) days of service of the second amended complaint; and

6.      If Plaintiffs fail to file a timely amended complaint, the leave to amend will be automatically withdrawn without further order and this case will be closed.

IT IS SO ORDERED.

Dated:   February 5, 2021         _____

SENIOR  DISTRICT  JUDGE

---

[11] As discussed above, the Court is dismissing all claims in this case, but is granting leave to amend for some claims. Any amended complaint should avoid improperly lumping defendants together and should adequately distinguish claims and alleged wrongs among the Defendants.